# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION

C.C., V.M., L.R., and K.G.

Plaintiffs,

v.

WILDERNESS TRAINING &
CONSULTING, LLC (d/b/a FAMILY
HELP & WELLNESS); WTC
HOLDCO, LLC; SOLSTICE EAST,
LLC; TRAILS CAROLINA, LLC; and
JOHN DOE ENTITIES 1-10,

Defendants.

Case No. _____

**COMPLAINT**

***JURY TRIAL DEMANDED***

_____

## PLAINTIFFS' COMPLAINT FOR DAMAGES

COME NOW Plaintiffs, C.C., V.M., L.R., and K.G., by and through counsel,

and respectfully allege as follows:

## I. INTRODUCTION

1.      This action arises from the systematic abuse, neglect, exploitation and

forced labor of the Plaintiffs at a corporate-controlled residential facility that had

promised to provide the vulnerable minors with therapeutic treatment.

2.      The Defendants are all a part of the Troubled Teen Industry ("TTI"),

which is a notorious moniker that has developed to refer to the nationwide network

1

of for-profit therapeutic programs that prey on so-called "troubled teens" and their desperate families.

3.    TTI facilities, like Defendants Solstice East, LLC ("Solstice") and Trails Carolina, LLC ("Trails"), operate as cash machines for private equity firms and investors who operate the facilities through layers of management companies, such as defendants Wilderness Training & Consulting, LLC ("WTC"), otherwise known as Family Help & Wellness ("FHW"), and its manager, WTC Holdco, LLC.

4.    TTI facilities, including several facilities owned and operated by WTC/FHW in North Carolina, are increasingly being shuttered by state regulators or facing financial insolvency following resident injuries and deaths that have garnered substantial media attention.

5.    Like other TTI facilities, the Defendants recruited children through sophisticated marketing that promised families their children would receive cutting-edge care and developmental services in tranquil, therapeutic settings.

6.    The reality, as seen through Plaintiffs' experiences, is that after families are sold on Defendants' promises and shell out tens of thousands of dollars, their children are abused, neglected, subjected to humiliation and shame, coerced, and forced to perform unpaid labor throughout their stay.

7.    The Defendants did this through a systemic method of coercion and control over residents, punishing residents through discipline, humiliation, food and

2

hygiene restrictions, and other measures to maintain the residents' compliance with the forced labor demands and to keep the tuition payments coming in.

8.      The result is that Defendants substantially profited from the systematic forced labor, abuse, and neglect of vulnerable children while their unsuspecting parents paid hundreds of thousands of dollars to their children's abusers.

## II. <u>THE PARTIES</u>

9.      Plaintiff C.C. is a young adult living in Massachusetts. She was a minor for most of the time she was a resident at Solstice from April 2017 through June of 2018. She turned 18 a few months before leaving Solstice.

10.      Plaintiff V.M. is a young adult living in North Carolina. He attended Trails from November 2017 through February 2018. He then attended Solstice from February 2018 through April 2019. He was a minor the entire time he was at Trails and Solstice.

11.      Plaintiff K.G. is a young adult living in New York. She attended Solstice from November 2017 through August 2018. She was a minor the entire time she was at Solstice.

12.      Plaintiff L.R. is a young adult living in Illinois. She attended Trails from March 2020 through July 2020. She turned 14 while she was at Trails.

13.      Defendant Solstice, LLC is a North Carolina liability company with its principal place of business at 530 Upper Flat Creek Rd., Weaverville, NC 28787.

3

14.     Defendant Trails Carolina, LLC was a for-profit wilderness therapy program for adolescents. Trails Carolina, LLC was a limited liability company formed in North Carolina, which closed in 2024 following several student deaths and a state investigation, with a principal office at 500 Winding Gap Road, Lake Toxaway, NC 28747. Trails Carolina's mailing address is 530 Center Street NE Ste. 700, Salem, OR 97301. Defendant Wilderness Training & Consulting, LLC was the member manager of Trails Carolina, LLC.

15.     Defendant Wilderness Training & Consulting, LLC (d/b/a "Family Help & Wellness") is the managing manager of defendant Solstice, LLC.

16.     Defendant Wilderness Training & Consulting, LLC (d/b/a "Family Help & Wellness") was the managing manager of defendant Trails Carolina, LLC.

17.     Defendant Wilderness Training & Consulting, LLC (d/b/a "Family Help & Wellness") is an Oregon limited liability company with its principal place of business at 530 Center Street, NE, Suite 700, Salem, Oregon 97301.

18.     The CFO of Wilderness Training & Consulting, LLC is Wayne E. Laird of Oregon.

19.     Wilderness Training & Consulting, LLC provides financial stability, accounting and marketing services, and advice to its partner programs.

20.     Wilderness Training & Consulting, LLC provided financial stability, accounting and marketing services, and advice to defendant Solstice, LLC.

4

21.     Wilderness Training & Consulting, LLC provided financial stability, accounting and marketing services, and advice to defendant Trails Carolina, LLC.

22.     Defendant WTC Holdco, LLC is an Oregon limited liability company with its principal place of business at 530 Center Street, NE, Suite 700, Salem, Oregon 97301.

23.     WTC Holdco, LLC is the manager of defendant Wilderness Training & Consulting, LLC.

24.     WTC Holdco, LLC provides financial stability, accounting services, and marketing and managing assistance to its partner programs.

25.     WTC Holdco, LLC provides financial stability, accounting services, and marketing and managing assistance to defendant Solstice, LLC.

26.     WTC Holdco, LLC provides financial stability, accounting services, and marketing and managing assistance to Defendant Trails Carolina, LLC.

27.     WTC Holdco, LLC provides financial stability, accounting services, and marketing and managing assistance to Defendant Wilderness Training & Consulting, LLC.

28.     WTC Holdco, LLC's members include Wayne E. Laird of Oregon; JLC Family, LLC; Opal Creek Capital, LLC, a private equity firm; PGO, LLC; and FHW/THP Blocker, Inc., a Texas private equity firm.

29.     Defendants John Doe entities 1-10 are entities, including but not limited to insurance companies, management companies, and other business entities, whose identities are presently unknown to Plaintiffs but who may be liable for the acts and omissions alleged herein.

## III.   JURISDICTION AND VENUE

30.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves claims arising from a federal question under 18 U.S.C. §§ 1581, 1584, 1589, 1590, 1594, 1595(a), and 2255.

31.     This Court has general and specific jurisdiction over Trails and Solstice because their principal place of business is or was in North Carolina and because the claims in this matter arise out of Trails and Solstice's contacts with North Carolina.

32.     This Court has specific jurisdiction over WTC Holdco, LLC because it conducts substantial business in North Carolina and because it manages and directs WTC/FHW, Trails, and Solstice, and through that control and oversight purposefully created minimum contacts with North Carolina when it availed itself of, and benefited from, directing activities in the state of North Carolina. Plaintiffs' claims arise out of WTC Holdco, LLC's contacts with North Carolina, WTC/FHW, Trails, and Solstice.

33.     This Court has specific jurisdiction over WTC/FHW because it conducts substantial business in North Carolina and because it manages Solstice and

6

Trails, and through that control and oversight purposefully created minimum contacts with North Carolina when it availed itself of, and benefited from, directing activities in the state of North Carolina. Plaintiffs' claims arise out of Wilderness Training & Consulting, LLC's contacts with North Carolina.

34.     This Court has specific jurisdiction over the claims of all Plaintiffs because their injuries arose from conduct that occurred at facilities in North Carolina, and their claims directly relate to that North Carolina-based conduct.

35.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims alleged occurred within this judicial district.

## IV.     STATEMENT OF FACTS

**A. Defendants Falsely Promised Industry-Leading Therapeutic Services in a Safe and Nurturing Environment for Teens Led by Trained and Qualified Professionals**

**1. WTC/FHW Provided the capital, management, and marketing.**

36.     Defendants are a sophisticated for-profit teen and young adult therapeutic care enterprise of investors, private equity firms, management and consulting companies, and so-called therapeutic facilities for teens and young adults.

37.     Defendants have collectively profited from their involvement in this enterprise through generating millions of dollars in revenue by holding themselves

7

out as expert mental healthcare providers to desperate families and so called "troubled teens."

38.     The below is a picture taken from FHW's website showing the cluster of affiliated facilities, including Trails, Solstice, and Solstice West, under its management and control:



39.     Defendants, as they do in the picture below taken from WTC/FHW's website, market their facilities, like Trails and Solstice, as industry leading "program partners" that provide "outstanding care and outcomes":

**Who are the program partners?**
FHW partners are some the leading experts in adolescent behavioral health with the education, experience, and passion to provide outstanding care and outcomes.

8

40.     Defendants specifically market to children with significant and unique vulnerabilities, including experiencing self-image issues, peer pressure, bullying, low self-esteem, depression, and anxiety.

41.     Because of these unique mental health issues, residents at facilities like Solstice and Trails, or any of WTC/FHW's other facilities, are at an elevated risk of trauma and are especially vulnerable.

42.     WTC/FHW markets their facilities as high quality last stops for children and families when other treatment options have failed, stating the following on its website:

> "When local options fail or lack the requisite intensity, FHW partner programs step in. Families find us looking for high quality, professional provided care for their child. Across a variety of ages and diagnoses, and program types, FHW program partners provide the answers our families are seeking."

43.     WTC/FHW affirmatively promised improvement, stating on its website that "[a]fter your child goes through one of our programs, they <u>will</u> have developed the skills necessary to lead a healthier, happier life." (emphasis added)

44.     WTC/FHW markets its partner programs as a natural progression from one another, with students "progressing" through care such that they leave one facility and move straight into another.

9

45.     The following is a picture from WTC/FHW's website showing the marketed progression between WTC/FHW-owned and -controlled facilities, including Solstice:



46.     This step-by-step integration allows Defendants to trap residents into a years-long commitment wherein the resident stays under Defendants' control, continues to work, and the resident and/or their family continues to pay Defendants hundreds of dollars per day.

47.     Tim Dupell is WTC/FHW's founder and CEO.

48.     Tim Dupell is also the manager of Opal Creek Capital, LLC, which is a private equity firm that is a member of defendant WTC Holdco, LLC.

10

49.     Tim Dupell personally represented on WTC/FHW's website, as shown below, that WTC/FHW partners (including Solstice) would treat students with respect and compassion, that families could trust in "increased safety" for their children, and that FHW had "strong strategic and financial management" that made it and its partner facilities "caring and stable.":

> **Operator ownership creates exceptional dedication**. *A significant level of operator ownership creates increased safety and consistency that families can trust. Our program owners are fully vested in helping teens and young adults improve their lives.*
>
> **Partner with great people**. *I only want to partner with great people who care about providing high levels of respect, dignity and compassion. This creates a strong culture and makes it enjoyable to come to work every day.*
>
> **Experience matters**. *Experience in the industry and passion for helping families combined with strong strategic and financial management creates a sustainable, caring and stable organizational environment.*

50.     Tim Dupell further describes on the Trails website how FHW partnered with several adolescent behavioral health facilities that were in financial distress, including Asheville Academy for Girls -- which later closed after several student deaths within a two-month period and was cited for inadequate staffing.

51.     Tim Dupell personally stated on the Trails Carolina website that "[w]hile Trails is owned and operated by Graham Shannonhouse, Family Help & Wellness (FHW) is a partner of Trails helping with financial, management, and marketing support."

11

52.     Plaintiffs and their families relied on WTC/FHW's representations of expertise and safety when choosing to enter WTC/FHW's facilities, to remain in them for months, and to continue to pay hundreds of dollars per day in tuition.

53.     Defendants never marketed that Solstice or Trails were understaffed or unsafe, or that they were largely run by underqualified young adults that were not much older than the residents, and that residents, including Plaintiffs, spent nearly all of their time at Solstice and Trails being supervised by undertrained and unqualified staff.

54.     Defendants never marketed the true reality of their partner programs, which was that students were subjected to physical abuse, neglect, food and clothing deprivation, injury, coercion, and continuous forced labor.

2. **Trails misrepresented its program and closed following resident deaths and license revocation.**

55.     Trails repeatedly misrepresented its program after resident deaths and dozens of citations from the North Carolina Department of Health and Human Services ("NCDHHS").

56.     A Trails resident died in 2014 while attempting to run away from the facility.

57.     The investigating sheriff released a public statement saying that Trails did not fully cooperate with the investigation.

12

58.    The subsequent NCDHHS investigation into the death found that Trails waited five hours after noticing the child was gone before it called for help and that had Trails acted sooner there would have been an increased chance of finding the boy before he died.

59.    Several lawsuits filed within the last few years by former Trails residents all consistently alleged that Trails sexually assaulted residents, physically abused them, and denied them basic needs, such as food, water, and adequate clothing during extreme weather.

60.    Recent reporting has detailed interviews with survivors from 2012 describing experiences nearly identical to those in the recent lawsuits, and to those suffered by L.R. and V.M.

61.    The 2012 survivors reported spending nearly all of their time in groups of 8-12 resident children, living in tents, and being supervised by minimum-wage earning staff who had no mental healthcare qualifications. Residents went for weeks without access to showers and were denied access to bathrooms.

62.    One survivor reported being forced to defecate in his pants, then being made to wear the soiled pants for two weeks. This is consistent with allegations in a recent lawsuit and to what L.R. and V.M. witnessed while at Trails.

63.    The survivors all report an environment of shaming and ridicule. Trails staff employed a "break you down to build you up" process through which shaming,

13

humiliation, and manipulation were all tactically used as part of Trails' so-called therapeutic methods.

64.     There are now hundreds of online reviews and posts describing Trails as a horrific facility that created trauma and worsened residents' mental health prognoses.

65.     Former Trails staff was quoted as saying that "[o]ne of the issues of the place is that the people that spend the majority of time with them [residents] are not trained therapists." That same former staffer said he was given 3 days of training before being sent into the woods, unsupervised, with a group of struggling teens.

66.     Trails represented on its website that "[o]ur talented team are experts in their respective disciplines and have the passion and experience to build trust with your child…"

67.     Trails promised residents that it had a "deep expertise in clinical theory and evidence-based practices" that allowed it to "achieve lasting, positive outcomes and address the unique developmental and psychological needs of each student."

68.     A Trails attorney admitted in a letter to the North Carolina Senate that residents received, at most, 1-2 hours of individual therapy a week.

69.     NCDHHS cited Trails for at least 50 separate deficiencies between 2010 and 2019.

14

70. The NCDHHS violations included citations for violating regulations surrounding seclusion, physical restraint, and isolation; and failing to protect residents from harm, abuse, neglect, or exploitation.

71. Neither Trails nor FHW/WTC have ever acknowledged these reports, findings, or reviews in marketing or representations to families or residents.

72. Neither Trails nor FHW/WTC have ever warned prospective residents and their families to the true risks and dangers of attending Trails.

73. Trails and FHW/WTC consistently marketed a false narrative that Trails was a safe and therapeutic environment that was almost guaranteed to improve children's mental health.

74. In 2015, Trails advertised that "[i]n fact, Trails is actually an acronym... every letter in T.R.A.I.L.S. stands for one of these values: Trust, Respect, Accountability, Integrity, Leadership, Service." Trails claimed that "Trust" was established "quickly" at Trails Carolina because students learn to trust that "their field instructors will provide for their safety" and "trust the therapeutic process."

75. Trails marketed itself as "dedicated to the safety of your child," and that "safety comes first at trails."

76. Trails touted its accreditation to create the false impression that the facility was safe and well-run, as seen by this picture from its website:

15

## Stringent Standards for Outstanding Levels of Care

Trails Carolina is accredited by CARF, an independent accrediting agency. The rigorous accreditation process CARF requires high standards for safety, business practices, and services. Our accreditation serves to acknowledge that we have met a recognized national standard and submit to regular oversight.

77. Trails represented that it was a safe and therapeutic environment founded on "decades of experience and scientific research."

78. Graham Shannonhouse–Trails' CEO–further misrepresented that residents would receive treatment from qualified and licensed medical and mental health professionals, as shown on the Trails website below:

Your family's team will include your child's primary therapist, a family therapist, a medical coordinator, a certified teacher, and an equine specialist. The team takes into account your child in the context of family, peers, school, recreation, and self. This provides a deeper understanding of each student and allows our team to customize your child's treatment plan so that s/he can experience success throughout their varied aspects of life.

79. Graham Shannonhouse never warned that the children would spend nearly all of their time supervised by unlicensed and inadequately trained staff members, most of whom had only a GED or high school diploma.

80. Before losing its license, Trails marketed that it was "proud to be licensed by the North Carolina Department of Health and Human Services" and stated that Trails had a "challenging hiring process that ensures all employees are hand-selected and also uphold all our licensure agreements."

16

81. There are several dozen online reports that are consistent with L.R. and V.M.'s experiences at Trails, which were that Trails staff were abusive, demeaning, and manipulative.

82. Trails marketed and promised specific rates of improvement for residents through publishing on its website the purported results of a "5-year outcome study" that was "done in coordination with the University of Arkansas" (the "CReATE Study") and the Center for Research, Assessment, and Treatment Efficacy (CReATE). Trails claimed the CReATE Study provided legitimacy for its program and provided "evidence-based results for our methods."

83. CReATE is a private psychological services and education firm in Asheville, North Carolina. Upon information and belief, CReATE is not an independent academic research institution but a fee-for-service vendor that conducts outcome research for wilderness therapy programs and related facilities.

84. Citing the CReATE Study, Trails made the following claims about its services based on what was self-reported data from willing prior residents:

85. 98% of residents have less suicidal thoughts;

86. 96% of residents have less substance use;

87. 98% of residents have less aggression;

88. 93% of residents have less depression;

89. 99% of residents no longer show disruptive behavior.

17

90.     On a separate website, Trails reported that 98.9% of study participants "reported significant improvements in challenging behavior and mental health symptoms one year after graduating Trails Carolina." Trails stated this meant its program was "demonstrated to be highly effective in helping youth, adolescents, and their families overcome significant mental health challenges…"

91.     Trails did not qualify the study on its website or offer any explanation as to how its presented numbers were reached. Trails failed to disclose: (1) the data was entirely self-reported from participants who voluntarily responded; (2) the study had no control group; (3) the study did not account for participants who were subsequently placed in additional treatment facilities, consistent with WTC/FHW's practice; (4) how many prior residents refused to participate, could not be located, or were excluded from the results; or (5) that the numbers it presented could be misleading due to survivorship and selection bias and that they could be misrepresentations based on various statistical issues.

92.     Trails made these statements on its website after a student death, lawsuits, mounting online discourse, and NCDHHS citations – none of which are mentioned on the Trails website.

93.     CReATE conducted a remarkably similar study for the Four Circles Recovery Center, also in North Carolina, and found similarly high rates of improvements from self-reports of prior residents.

18

94.     In February 2024, a 12-year-old died during his first night at Trails Carolina of asphyxia due to smothering after Trails Carolina staff forced him to sleep in a fully enclosed bivy sack.

95.     The smothering occurred because Trails forced the boy to sleep in a "burrito hold" as it was called by Trails staff.

96.     A burrito hold is an abusive and illegal restraint method that entails staff forcing a child into a sleeping bag or sack with the end covering the child's face and body inhibiting their ability to breathe, limiting their access to light, and causing their temperature to rise from their own body heat. While within the upside-down bag, they often would be covered and tied with a tarp and/or would be held down by staff for the entirety of the night.

97.     The boy's tragic death was ruled a homicide.

98.     NCDHHS revoked Trails' license in May 2024 following the homicide, barred Trails from taking new residents, removed all residents from the facility, and fined it.

99.     Neither Trails nor WTC/FHW has ever taken responsibility for the homicide.

100.    Trails issued a statement following NCDHHS's revocation of its license, stating it was "surprised and disappointed to learn of the state's intent to revoke the program's license, given the progress we've made and continue to make."

19

101.   Trails never explained how killing a young boy with an illegal burrito restraint was evidence of its progress, or how it was evidence of improvement.

102.   Trails remains closed to this day.

3.   **Solstice rebranded for a few months after abuse and neglect allegations, then merged with another abusive facility and ultimately surrendered its license and closed after several resident suicides.**

103.   Solstice opened in 2012. Solstice was founded as an expansion of the Solstice RTC program in Utah, or Solstice West. Solstice and Solstice West were nearly identical programs. Both programs marketed the services of the other and represented that they both operated under the Solstice brand.

104.   WTC/FHW operated and controlled both Solstice and Solstice West.

105.   Kyle Gillett was a founding partner of Solstice and its executive director. Kyle Gillett was also the executive director of WTC/FHW.

106.   Just four years after Solstice opened, Defendants advertised Solstice in 2016 as "one of the leading residential treatment centers for troubled teens" that had "grown out of decades of experience working with adolescent girls in residential treatment."

107.   Solstice marketed itself as a "groundbreaking treatment facility for troubled adolescent girls" that was "all about the people" and promised to "help every young girl and their families repair, rebuild, and reconnect with one another."

20

108. NCDHHS completed a survey of Solstice in 2020 and released a corresponding 151-page report in which state officials documented dozens of instances of Solstice's abuse and neglect of residents.

109. The 2020 NCDHHS report found 115 medication errors in just a seven-month period and that Solstice had used abusive restraints and illegally restricted residents' communications with their families.

110. Solstice's attorney replied to the report by acknowledging the facility but denied the remainder of the report.

111. Solstice never confirmed that the abuse and neglect documented in the report were real and never warned residents of those dangers.

112. Online reviews about Solstice continued to mount, documenting a years'-long pattern of resident abuse and neglect.

113. Solstice rebranded as Magnolia Mill in early 2024.

114. When Solstice rebranded to Magnolia Mill, Solstice was not a profitable facility for FHW/WTC. This was in part because Solstice had significantly fewer residents and was operating at a financial loss due to the lack of revenue from resident tuition.

115. Carla Shorts founded Magnolia Mill; she was previously the executive director at Solstice.

21

116. Magnolia Mill advertised itself as a new facility, but it kept dozens of Solstice staff, including the clinical director, program director, admissions director, academic director, director of family services, and several therapists.

117. It is common for TTI facilities under common corporate ownership, like Solstice under FHW/WTC, to close and "rebrand" themselves after negative online reviews, investigations, and lawsuits cause admissions to drop.

118. FHW/WTC has rebranded several of its TTI facilities, as it did with Solstice, after admissions at the facilities dropped.

119. The rebranded facilities remain under the ownership and control of FHW/WTC, just as they were before the name change.

120. Magnolia Mill then merged with Asheville Academy for Girls ("AAG") in 2025 just a few months after Magnolia Mill rebranded from Solstice. Former Solstice staff moved from Magnolia Mill to AAG.

121. When it merged with AAG, Magnolia Mill was not a profitable facility for FHW/WTC. This was in part because Magnolia Mill had significantly fewer residents and was operating at a financial loss due to the lack of revenue from resident tuition.

122. AAG had a long history of documented resident abuse before North Carolina revoked its license in 2025.

22

123. News reports found that records from the Buncombe County Sheriff's Office dating back to 2016 showed at least 18 incident reports involving AAG, including a suicide, three sex offenses, a missing juvenile, four assaults, an overdose, two child abuse reports, one case of neglect, and three runaways.

124. NCDHHS cited AAG for failing to develop treatment strategies for suicidal patients, failing to dispense medication properly, and using illegal restraints against teenage girls.

125. There were two resident suicides at AAG in May 2025. NCDHHS' investigation found evidence of resident abuse and neglect.

126. North Carolina removed all residents from AAG, revoked AAG's license, and AAG remains closed to this day.

127. Before Solstice rebranded, NCDHHS cited Solstice for the same things it had found at Trails and AAG.

128. NCDHHS cited Solstice for failing to develop treatment plans, failing to properly dispense medication, failing to keep adequate records, providing inadequate discharge summaries, using illegal restraints and mischaracterizing restrictive interventions, and illegally restricting residents' communications with their parents.

129.   There is a pattern of documented abuse and neglect, shared ownership, shared employees, and shared processes and procedures at FHW/WTC facilities as demonstrated, at a minimum, by the similar findings at Trails, AAG, and Solstice.

### 4. WTC/FHW never acknowledged that it prioritized profits over resident safety and continues to misrepresent the safety and effectiveness of its programs.

130.   In early 2024, WTC/FHW faced a nearly $7 million shortfall across its programs. Reporting based on internal WTC/FHW documents shows that WTC/FHW sought to cut $5 million in annual expenses, including the elimination of dozens of full-time positions, or nearly 11% of WTC/FHW's workforce.

131.   WTC/FHW planned the reductions to keep their financial "lender in their happy place."

132.   The death at Trails in 2024 occurred while WTC/FHW was planning staffing cuts.

133.   To increase revenue, WTC/FHW decreased costs at Trails and Solstice, this included hiring less staff, hiring less qualified staff, and paying staff less. While scaling back on staff quality and numbers, WTC/FHW simultaneously expanded its intake criteria to include students with more acute mental distress. This created a long-term culture at Trails and Solstice, and other WTC/FHW facilities, wherein financial viability outweighed resident safety. This culminated at Trails and AAG

with student deaths, license revocation or surrender, and closure of both facilities after years of documented and alleged resident abuse and neglect.

134. After all of this, WTC/FHW has never changed the tone of its marketing, apologized to former residents and their families, or warned current or prospective residents.

135. WTC/FHW currently markets itself, and its umbrella of remaining facilities as "the leading provider of private pay behavioral health for adolescents and young adults" and that WTC/FHW "continues to grow due to outstanding outcomes."

## B. Trails and Solstice Employed Systemic Abuse, Isolation, Punishment, and Threats to Coerce Plaintiffs Into Forced Labor and Continued Enrollment

136. WTC/FHW facilities all employ a similar method of controlling residents through coercion, and emotional, psychological, and physical abuse.

137. At WTC/FHW facilities, discipline and consequences are the centerpiece of an environment in which vulnerable children and young adults are psychologically broken down into compliance starting on their first day of admission.

### 1. Pattern of Systematic Abuse, Coercion, Punishment, and Threats at Solstice

138.   C.C., V.M., and K.G. (hereinafter, the "Solstice Plaintiffs" were minors while at Solstice.

139.   Solstice employed a hierarchical level system in which residents began at the first phase ("Orientation") and were required to advance up seven phases before Solstice would recommend to parents that their children either come home or go to another WTC/FHW controlled "after care" facility.

140.   Each phase commonly lasted months, and ascension through phases was always at Solstice staff discretion.

141.   Solstice admitted that nearly half of their prescribed services were ineffective. Solstice commonly told parents, including the Solstice Plaintiffs', that students could "hold it together" for 6 months and not truly engage with Solstice therapeutic processes.

142.   This meant that Solstice believed its residents would effectively fake progress and mislead Solstice's proclaimed industry-leading expert staff for six months.

143.   Solstice accordingly told parents at intake, including the Solstice Plaintiffs' parents, that residents should stay at least 9 to 13 months to ensure progress. Solstice made this recommendation before the Solstice Plaintiffs ever enrolled at Solstice.

26

144.   Solstice charged the Solstice Plaintiffs' parents hundreds of dollars per day for each day the Solstice Plaintiffs were at Solstice. Solstice did not take insurance such that the Solstice Plaintiffs' parents were forced to pay out of pocket for the significant cost.

145.   All residents at Solstice were immediately stripped of all "privileges" when they arrived.

146.   Residents had no privileges while in Orientation and would slowly earn privileges, completely at Solstice's discretion, the longer they were at Solstice.

147.   Solstice did not allow residents in Orientation to speak with their families.

148.   Solstice took complete and exclusive control of residents' access to food, clothing, hygiene, and their ability to speak, and limited all of it under a privileges system wherein access/permission was granted solely if residents unquestioningly complied with Solstice's commands.

149.   Advancement required compliance with Solstice's demands; specifically, that residents demonstrate "more openness to being in program" and that they trust the staff.

150.   Solstice used its disciplinary phase system as a coercive tool that required residents' unquestioning compliance as a condition for leaving.

27

151.    Solstice would move residents back phase levels and strip privileges for alleged disciplinary infractions, such that residents, including the Solstice Plaintiffs, believed that the only way to ultimately leave Solstice was to demonstrate complete compliance and trust in Solstice staff.

152.    Solstice used isolation and discipline as a coercive tool to force vulnerable children into compliance with forced labor.

153.    Solstice stated that most of its disciplinary phases were never imposed for more than a few hours. This was a misleading statement. Solstice regularly placed residents in traumatic disciplinary phases for days or weeks.

154.    Solstice placed residents on "Comm Block" as punishment where they would be forbidden from speaking to anyone for days or weeks.

155.    Solstice placed residents on "basement protocol" as punishment where they were forced to drag a mattress to the basement and stay there day and night for days while all lights were left on.

156.    Solstice rationed food for residents on basement protocol.

157.    The Solstice Plaintiffs recall hearing students screaming in the basement as they were left for days.

158.    Solstice placed residents on "Self Focus" or "Ghost" as a punitive measure wherein residents were forced to stay among peers but restricted from talking.

28

159.	Solstice placed residents on Self Focus for days at a time.

160.	The end result was peers would ridicule and shame residents on Self Focus since they couldn't respond.

161.	Peers were even forced to dress and apply makeup to residents on Self Focus, dressing them as they saw them. Peers would often berate residents during this process and dress them in insulting and demeaning ways. This punishment was especially horrific and traumatizing for the vulnerable children on Self Focus who were forced to take the abuse in silence.

162.	Self Focus was done publicly to threaten the other residents.

163.	Solstice employed a draconian disciplinary system that also relied on physical punishment.

164.	Solstice students were forced to exercise to the point of exhaustion and sickness as punishment for alleged non-compliance with Solstice's commands.

165.	Solstice forced students to run, do jumping jacks, pushups, and sit ups for hours on end until they passed out or vomited.

166.	Solstice would sentence resident girls to perform extensive exercise as a punishment.

167.	Solstice restricted meals and access to food as punishment for non-compliance.

168.   Solstice stated its discipline and consequences were "natural, logical and time-limited" and that they were all "therapeutically based."

169.   The punishment Solstice used on residents was not logical or therapeutically based.

170.   Solstice cut off all direct contact between the Solstice Plaintiffs and their families for their first months at Solstice limiting the Solstice Plaintiffs to hand-written letters.

171.   Solstice staff screened all outgoing letters and forced residents to re-write any letters that mentioned anything negative about Solstice.

172.   Once the Solstice Plaintiffs earned the privilege of calling their families, Solstice staff listened in on all calls and would pause or end calls if the Solstice Plaintiffs mentioned anything negative about Solstice.

173.   Solstice would punish any resident that spoke negatively about Solstice on a call with their family.

174.   Solstice restricted residents' ability to talk honestly with their families to keep residents enrolled and working and to keep the tuition payments flowing.

175.   Solstice staff would tell parents that residents were manipulating them whenever they spoke negatively of Solstice, and that the parents should not believe their children.

30

176. The end result was that if any residents, including the Solstice Plaintiffs, wanted to tell their families about their conditions and abuse, Solstice would punish them and tell their parents their children were lying.

177. Solstice marketed that "[f]amilies will be regularly and intensively involved in their daughter's therapeutic process."

178. Solstice used shame and humiliation to coerce residents into compliance.

179. Solstice used attack therapy, which ritualized public humiliation, where Solstice staff would verbally assault a resident's character, appearance, and perceived shortcomings. Solstice staff would also encourage peers to do the same.

180. Solstice used attack therapy as punishment for residents' non-compliance and the degree or severity of the attacks were directly related to the alleged degree of non-compliance.

181. Solstice promised that it would not "engage in nontraditional or high-risk interventions."

182. Attack therapy is a punitive and non-traditional process.

183. Solstice made residents participate in "feedback group" where residents were forced to write out their flaws and read them to staff and other peers. Solstice staff would also read notes they had written about residents' flaws in front of the group. This was all done punitively.

31

184.   All residents were subjected to invasive and repeated strip searches in front of staff. Solstice allowed male staff to search teenage girls, and to be in the room watching while they were searched with nothing more than a small towel to cover their bodies. Staff would tell the girls to "dance around" in the room while naked. This happened frequently and without cause.

185.   Solstice used violent physical restraints against teenage residents as punishment.

186.   Solstice used physical restraint immediately and publicly against girls who did not comply with Solstice staff demands.

187.   Solstice placed residents, including the Solstice Plaintiffs, into what it called "burrito holds."

188.   A burrito hold is an abusive restraint practice that entails staff holding a child down in a sleeping bag with the end covering the child's face and body inhibiting their ability to breathe, limiting their access to light, and causing their temperature to rise from their own body heat. While within the upside-down bag, they often would be covered and tied with a tarp and/or would be held down by staff for the entirety of the night.

189.   Residents at FHW/WTC owned facilities have died and been injured while in burrito holds.

190. The Solstice Plaintiffs saw Solstice staff put minor residents in chokeholds until the residents passed out – this was done publicly in a threatening manner to others.

191. Solstice stated on its website that physical force and restraint would not be used against residents, representing that "fear of punishment tends to be short lived, so that when the external controls are removed the 'change' departs with it."

192. Solstice used physical violence, physical and emotional abuse, and manipulation to obtain residents' compliance and to swiftly and publicly punish any teenage girls that got out of line as a threat to the others.

193. Solstice marketed that it achieved resident compliance through "developing internal values such as respect, responsibility, love, family relationships, and personal growth" and not through punishment.

194. Solstice staff called residents "entitled bitches" and other derogatory terms in front of other residents.

195. Solstice staff forced residents to report the infractions of other residents to staff, whether true or not, to avoid punishment and to maintain privileges.

196. Solstice's conduct created a highly fearful environment of constant conflict with no trust between residents. This put the Solstice Plaintiffs in a state of persistent hypervigilance, fear, and isolation, which Solstice fostered to ensure their compliance.

33

197.   Solstice represented itself to the Solstice Plaintiffs' families, and other families, as an expert and the leading provider of teen mental healthcare in the country.

198.   Solstice told the Solstice Plaintiffs' families, and other families, that residents would lie about conditions at Solstice to manipulate parents into discharging them early.

199.   The Solstice Plaintiffs' parents relied on Solstice's representations and followed Solstice's recommendations, which included leaving their daughters at Solstice for months.

200.   The Solstice Plaintiffs were accordingly left in the coerced position of being required to unquestioningly submit to and approve of all of Solstice's abusive processes and procedures and to do so without complaint to their families, out of fear of punishment and having more time added to their stay.

### 2.   Pervasive Forced Labor and Economic Exploitation at Solstice

201.   Within this punitive and hypervigilant environment, Solstice required all residents to perform hours of daily manual labor without pay.

202.   Solstice used a system to place girls into one of four groups: summer, spring, autumn, and winter.

203.   Each group was assigned different forced labor tasks, but all groups were required to perform labor throughout the day.

34

204. The labor that Solstice forced the Solstice Plaintiffs, and other residents, to perform was extensive, and it included the following:

a. Cleaning all Solstice facilities, to include vacuuming, dusting, wiping base boards, hand mopping floors with rags, cleaning toilets, taking apart and cleaning an industrial stove, cleaning out refrigerators, cleaning out tampon bins with no gloves, cleaning out dryer vents and air conditioning vents with a knife, moving furniture to clean, cleaning bookshelves and ensuring all books were arranged in alphabetical order, and cleaning up urine, feces, and blood in bathrooms without gloves;

b. Kitchen operations, including food preparation and service, washing dishes and trays, cleaning, sweeping, mopping, restocking supplies, setting up and breaking down a buffet line for other residents;

c. Shoveling snow from Solstice property walkways, ramps, and the parking lot;

d. Sweeping and cleaning Solstice property walkways, ramps, and the parking lot;

e. Raking, bagging, and disposing of leaves;

f. Landscaping, including pulling weeds, mulching, cutting grass around the pond with pliers, gardening, shoveling dirt, raking, chopping roots;

35

g. Cleaning out and maintaining Solstice transport vans, including wiping down all floors, windows, and surfaces; removing mud and animal droppings from the vans; checking oil, blinkers, fuel, tire pressure, and headlights before each time Solstice staff used the vans;

h. Performing "agricultural" duties, including shoveling horse manure; caring for, feeding, and cleaning horses, chickens, and pigs and their living areas; cleaning and organizing barn and animal areas; restocking supplies in barn and animal areas; transporting and storing deliveries, such as hay, in barn and animal areas; cleaning out moldy chicken coops without masks or protective equipment;

i. Chopping firewood and putting it in the personal cars of Solstice staff;

j. Cleaning and washing the cars of Solstice staff members;

k. Performing quality control inspections with staff, teaching residents how to perform labor, and supervising other residents;

l. Deep cleaning for weeks to ensure the facility was "tour ready" for prospective residents or for family visits.

205. All forced labor at Solstice was involuntary for residents and the Solstice Plaintiffs.

206. Solstice punished students, including the Solstice Plaintiffs, whenever they refused to work.

36

207. Solstice punished students, including the Solstice Plaintiffs, whenever Solstice found their work unsatisfactory.

208. All cleaning and labor were monitored by a Solstice appointed resident "Inspector." The Inspector would inspect all work every day, and if a resident did not clean or perform their task perfectly, the resident got a check mark. Solstice did not pay the Inspector for the supervision of other Solstice residents.

209. If a resident got too many check marks, they were forced to perform more labor, such as do another deep clean of the kitchen, while other students were allowed to watch a movie.

210. Solstice staff would also inspect the forced labor of the Solstice Plaintiffs and other residents. If staff found something unacceptable, such as visible dirt, staff forced the Solstice Plaintiffs and other residents to re-do the work, assigned them more work, and put them on a punishment, such as Comm Block.

211. All residents performed the forced labor described herein for at least 4 hours every weekday and at least 6 hours each weekend day.

212. Solstice forced residents, including the Solstice Plaintiffs, to perform labor while sick or injured.

213. Solstice also forced residents, including the Solstice Plaintiffs, to perform labor at volunteer organizations and at local farms.

214. Solstice marketed this volunteer work in the community and on its website to give the facility a positive public image.

215. The volunteer work was mandatory, and Solstice punished students who did not comply.

216. Solstice would take away "privileges" and threaten to take away privileges from residents that refused to work or those that did unsatisfactory work.

217. As a result of refusing to work, or performing unsatisfactory work, students and the Solstice Plaintiffs lost access to food, hygiene products, were placed on Ghost Phase, were sent to the basement, were made to perform exercise until they were sick and exhausted or had communication with their families restricted. The Solstice Plaintiffs all believed they would suffer these punishments at any time if they refused to work.

218. Solstice shamed residents in "feedback group" who did not comply fully with its forced labor demands.

219. The Solstice Plaintiffs all believed they would be shamed in feedback group as a punishment for refusing to work.

220. If a resident refused to work while sick or injured, Solstice would make them run or do hundreds of jumping jacks.

221. Additional forced labor chores and assignments were given out to residents as punishment. The chore could be spending hours cleaning a bathroom with a toothbrush.

222. The Solstice Plaintiffs all believed they would be punished if they refused to work.

223. The Solstice Plaintiffs all believed they would be punished by losing privileges if they refused to work. This included food restrictions, the ability to speak, and the ability to communicate with their families.

224. The Solstice Plaintiffs all believed they would be punished with excessive exercise if they refused to work.

225. The Solstice Plaintiffs never saw Solstice employees clean at Solstice.

226. Solstice never paid the Solstice Plaintiffs or their families for the hundreds of hours of forced labor that the Solstice Plaintiffs performed while at Solstice.

227. Solstice received an economic benefit from the forced labor of residents by replacing paid employees and reducing operational costs for: (a) custodial and maintenance services; (b) administrative and coordination services; (c) resident and labor supervision, scheduling, and management; (d) marketing; and (e) quality control.

39

228.   Solstice required the labor to be performed to exacting and commercial grade standards.

229.   Solstice disguised the work as discipline that promoted a positive peer culture, when in reality the labor served primarily to reduce facility operating costs by replacing paid staff with unpaid minor residents.

3.   **Pattern of systematic abuse, coercion, punishment, threats, and forced labor at Trails.**

230.   Plaintiffs L.R. and V.M. (the "Trails Plaintiffs") were both minors the entire time they were at Trails.

231.   Trails subjected the Trails Plaintiffs to a forced strip search by a staff members with no medical training within minutes of the Trails Plaintiffs arriving at Trails. There were several people in the room when the searches were performed.

232.   Trails subjected the Trails Plaintiffs to several more forcible strip searches while they were at Trails. Trails performed at least one strip search on L.R. while L.R. was in the woods in full view of the resident group and several male staff members.

233.   Trails took complete and exclusive control of residents' access to food, clothing, hygiene, their ability to speak, and what they could say and limited all of it under a privileges system wherein access/permission was granted solely if residents unquestionably complied with Trails' commands.

40

234. All of these were privileges, and the Trails Plaintiff had to earn them back, and maintain them, by complying with Trails' every demand.

235. Trails told the Trails Plaintiffs that its abusive restrictions were necessary and part of their treatment.

236. Trails told the Trails Plaintiffs that to speak when staff were not around was to conspire against the facility. Trails punished the Trails Plaintiffs anytime they spoke to another resident while Trails staff was not around.

237. Trails marketed that they would "immediately get to work making sure they [new residents] receive the support they need" when new residents arrive at Trails.

238. The Trails Plaintiffs received no actual therapy while at Trails. They did not receive the therapeutic services Trails promised them and their families.

239. Trails employed several abusive and traumatizing practices that it considered therapeutic. Trails forced the Trails Plaintiffs to write what was known as a "Trails Letter" to their parents detailing all of their mistakes and poor decisions. Trails then forced them to stand in front of the group and read the letters aloud. Residents later berated them for what they read. Their refusal to write and read the letters aloud would have resulted in them losing privileges.

240. Unlicensed Trails staff told the Trails Plaintiff their mistakes and decisions were all their own faults. They did this in front of the group of residents.

41

241.   The Trails Plaintiffs understood that to disagree with staff meant they were resisting, and that meant they would be punished or lose privileges.

242.   Trails threatened the Trails Plaintiffs and other residents with forced and excessive exercise as punishment. The exercise could include performing hundreds of jumping jacks or pushups.

243.   Trails threatened the Trails Plaintiffs with forced labor as a punishment.

244.   Trails marketed that "we provide a healthy environment for a variety of ages to receive treatment."

245.   Trails regularly threatened the Trails Plaintiffs and other residents with the story of the boy who died at Trails in 2014 while attempting to flee the facility. Trails specifically told V.M. that "He [the boy who died in 2014] ran away. If you don't run away, you don't die." Trails made similar threatening remarks about the boy who died in 2014 to L.R.

246.   Trails used the boy's death as a traumatic deterrent against running away from the facility and made these remarks to kids as young as 12 and 13, including the Trails Plaintiffs.

247.   Trails staff promoted a hostile, untrusting, and abusive environment. Trails staff consistently belittled and criticized the Trails Plaintiffs and encouraged other residents to do the same. The result for the Trails Plaintiffs was a steady stream of hostility and humiliation.

248. Trails marketed that its priority was "[d]eveloping relational intelligence, social skills and a concrete understanding that we are all members of interdependent communities."

249. Trails forced the Trails Plaintiffs to endure dangerous conditions.

250. Trails forced the Trails Plaintiffs to participate in arduous hikes through the woods for days or weeks at a time, carrying a 100-pound backpack through rain and fluctuating temperatures.

251. Trails forced the Trails Plaintiffs to remain in wet, cold, and dirty clothes after forcing them to hike in freezing rain. They both got sick after these events.

252. As it did with other residents, Trails refused to allow the Trails Plaintiffs to stop for bathroom breaks while on a hike. Girls in their groups were forced into the humiliating position of having to urinate on themselves then to continue hiking in their soiled clothes.

253. Trails knew girls were urinating on themselves during hikes and refused to allow them to stop or to change clothes.

254. Trails marketed that it "emphasize[d] self-care and [taught] students to feel confident and capable across a variety of situations and relationships."

255. Trails threatened residents, and the Trails Plaintiffs, with consequences for stopping while on the hikes. Trails threatened the Trails Plaintiffs and other

residents with consequences for asking to use the bathroom. Any sign of noncompliance or resistance was met with consequences or threats of consequences.

256.   Trails forced the Trails Plaintiffs to set up and break down their camps, to start fires, to cook all food over the fires, and to clean up. Trails did this every day that Plaintiffs were on a hike – sometimes for weeks at a time.

257.   Trails staff refused to help the Trails Plaintiffs or the other residents. If wood scraps were wet from a recent rain, there would be no fire, and there would be no dinner.

258.   Trails refused the Trails Plaintiffs and other residents medical attention.

259.   Once while on a hike, L.R. became so sick that she developed a fever, cold and hot sweats, shaking, and she was having trouble breathing. Trails checked her temperature and confirmed it was elevated. Trails refused her requests for medical attention and refused to give her any medication. When her vision became blurry and black, unlicensed Trails staff told her to "sleep it off." Trails never told Plaintiff's parents about the episode, which lasted for three days.

260.   V.M. experienced severe and worsening knee pain, beginning early in his stay at Trails. V.M. reported the pain daily to Trails staff. Trails staff ignored all of his reports, never once offering him medical care for the injury and instead threatening to punish him if he did not continue on weeks' long arduous hikes.

44

261.   Trails marketed that it would teach residents wellness, which includes topics such as "self-care practices" and "responsible use of medicine."

262.   The Trails Plaintiffs recall that Trails only let her shower a few times during their months at the facility.

263.   Trails offered limited food options for the Trails Plaintiffs and other residents.

264.   Trails served L.R. a peanut butter and honey tortilla for five days straight. On the sixth day, after becoming nauseous because the food was sickening. Plaintiff refused to eat it for lunch. Trails immediately placed her on "Safety," meaning she had no privileges.

265.   Trails then forced L.R. into a burrito hold that night as punishment for refusing to eat the tortilla. Plaintiff was not combative, she was not a flight risk, and she was not aggressive. Her alleged infraction was refusing to eat sickening food for the sixth day in a row. Trails put her in a sleeping bag, wrapped her in a tarp, and put weight on top of her. She was 13 years old at the time.

266.   Trails similarly forced V.M. to sleep in a burrito hold for at least seven consecutive nights.

267.   Trails marketed that it would help teach residents proper "sleep hygiene" and that "[s]tudents will even work with our culinary team to actualize nutrition lessons through hands-on learning on how to prepare healthy meals."

268. Within this punitive and hypervigilant environment, Trails required all residents to perform hours of daily manual labor without pay.

269. The labor that Trails forced the Trails Plaintiff, and other residents, to perform was extensive, and it included the following:

    a. Cleaning all Trails facilities;

    b. Forced labor while on hikes: carrying and caring for equipment; setting up and breaking down camp; cooking all food; cleaning and clearing camp;

    c. Performing quality control inspections with staff, teaching residents how to perform labor, and supervising other residents;

    d. Deep cleaning for weeks to ensure the facility was "tour ready" for prospective residents or for family visits.

270. All forced labor at Trails was involuntary for residents and the Trails Plaintiff.

271. Trails punished students, including the Trails Plaintiffs, whenever they refused to work.

272. Trails punished students, including the Trails Plaintiff, whenever Trails found their work unsatisfactory.

46

273.   All residents, including the Trails Plaintiffs, performed the forced labor described herein for at least 4 hours every weekday and at least 6 hours each weekend day.

274.   Trails forced residents, including the Trails Plaintiffs, to perform labor while sick or injured.

275.   Trails would take away "privileges" and threaten to take away privileges from residents that refused to work or those that did unsatisfactory work.

276.   As a result of refusing to work, or performing unsatisfactory work, Trails residents and the Trails Plaintiffs lost access to food, hygiene products, were placed on Safety, were placed in a burrito hold, and were threatened with punishments. The Trails Plaintiffs believed they would suffer these punishments at any time if they refused to work or comply with Trails' demands.

277.   Trails shamed residents who did not comply fully with its forced labor demands.

278.   The Trails Plaintiffs believed they would be shamed in feedback group as a punishment for refusing to work.

279.   If a resident refused to work while sick or injured, Trails would make them run or do hundreds of jumping jacks.

280.   Additional forced labor chores and assignments were given out to residents as punishment.

47

281.    The Trails Plaintiffs believed they would be punished if they refused to work.

282.    The Trails Plaintiffs believed they would be punished by losing privileges if they refused to work. This included food restrictions, the ability to speak, and the ability to communicate with their families.

283.    Trails never paid the Trails Plaintiffs or their families for the hundreds of hours of forced labor that the Trails Plaintiffs performed while at Trails.

284.    Trails received an economic benefit from the forced labor of residents by replacing paid employees and reducing operational costs for: (a) custodial and maintenance services; (b) staff labor for hiking tasks; (c) resident and labor supervision, scheduling, and management; and (d) quality control.

285.    Trails required the labor to be performed to exacting standards.

286.    Trails marketed this pervasive forced labor as a therapeutic technique in which residents learned to care for themselves.

287.    Trails humiliated, punished, and threatened any resident, including the Trails Plaintiffs, who showed the slightest resistance to Trails' forced labor demands.

288.    Trails further disguised the work as discipline that promoted a positive peer culture, when in reality the labor served primarily to reduce facility operating costs by replacing paid staff with unpaid minor residents.

48

289.   Trails isolated the Trails Plaintiffs and maintained complete control over their ability to speak with their parents.

290.   Trails did not allow L.R. to have any direct communication with her parents until two days before her Trails graduation.

291.   Trails similarly did not allow V.M. to speak directly with his parents until shortly before he left Trails, and only to facilitate his ultimate transfer to Solstice.

292.   The Trails Plaintiffs' therapists purportedly spoke with their parents on a regular basis. The therapists never accurately or honestly described the Trails Plaintiffs' conditions at Trails, their mental states, or the medical problems they were both experiencing.

293.   Trails was required by law to inform parents whenever minor residents experienced a medical problem.

294.   Trails was required by law to report any child abuse of its residents both to the state of North Carolina and the residents' parents.

295.   Trails never reported any of their abuse of the Trails Plaintiffs to their parents. Trails never reported to the Trails Parents that Trails had placed their minor children in a highly restrictive and illegal restraint for an entire night, or in the case of V.M., for seven consecutive nights.

49

296. Trails limited The Trails Plaintiffs' communications with their parents to written letters. Trails edited all of their letters to remove any negative mention of Trails. Trails refused to mail unedited letters to the Trails Plaintiffs' parents. Trails threatened several other punishments, beyond refusing to mail letters, if the Trails Plaintiffs refused to accept Trails' edits to their letters.

297. Trails limited the Trails Plaintiffs and other residents' abilities to honestly communicate with their parents to keep them all enrolled and working and to keep the parents paying the hundreds of dollars per day of tuition that Trails charged.

298. The Trails Plaintiffs were accordingly left in the coerced position of being required to unquestionably submit to and approve of all of Trails' abusive processes and procedures and to do so without being able to describe their abuses to her parents.

299. Trails consistently told the Trails Plaintiffs that their abusive conditions and neglect were actually therapy, that their mental symptoms were their own faults, and that any continuing symptoms were their own faults for not engaging with Trails' therapy.

300. The Trails Plaintiffs believed Trails' misrepresentations.

50

301.  At all times while Trails was threatening, punishing, and coercing the Trails Plaintiffs, Trails knew the Trails Plaintiffs were both very young and vulnerable and in a state of acute mental distress.

## C. Specific Harm to Plaintiffs

### C.C.

302.  As a direct result of Defendants' conduct, C.C. has suffered several serious and permanent injuries, including but not limited to the following:

    a.  Permanent neurological disorder due to Defendants' use of an electric shock device;

    b.  Severe psychological distress;

    c.  Delayed academic progress;

    d.  Lost wages and economic exploitation as a result of performing thousands of hours of unpaid forced labor;

    e.  Loss of trust in therapeutic institutions;

    f.  Diagnoses of Post-Traumatic Stress Disorder and severe social anxiety;

    g.  Sexual trauma from having male adult staff members watch her while she was in the shower and bathroom;

    h.  Sexual trauma from being forced to comply with repeated strip searches, or "popping" of her bra, in front of or by male adult staff members;

51

i. Persistent sleep disturbances; and

j. Difficulty forming and maintaining healthy relationships.

**V.M.**

303. As a direct result of Defendants' conduct, V.M. has suffered:

a. Diagnosis of Post-Traumatic Stress Disorder;

b. Manipulation by Solstice and Trails into enrolling at Solstice through an education consultant that Solstice and Trails recommended and worked with;

c. Severe knee pain through months of forced hiking while in pain that has developed into a permanent limiting and painful condition;

d. Severe psychological distress;

e. Delayed academic progress;

f. Difficulty forming and maintaining healthy relationships;

g. Loss of trust in therapeutic institutions; and

h. Lost wages and economic exploitation as a result of performing thousands of hours of unpaid forced labor.

**K.G.**

304. As a direct result of Defendants' conduct, K.G. has suffered:

a. Severe psychological distress;

52

b. Delayed academic progress;

c. Difficulty forming healthy relationships;

d. Lost wages and economic exploitation as a result of performing thousands of hours of unpaid forced labor;

e. Suffered sexual trauma from having several adult male staff members watch her shower and use the bathroom;

f. Difficulty forming and maintaining healthy relationships;

g. Persistent sleep disturbances;

h. Anxiety and PTSD; and

i. Loss of trust in therapeutic institutions.

**L.R.**

297. As a direct result of Defendants' conduct, L.R. has suffered:

a. severe psychological distress;

b. Delayed academic progress;

c. Difficulty forming healthy relationships;

d. Lost wages and economic exploitation as a result of performing thousands of hours of unpaid forced labor;

e. Loss of trust in therapeutic institutions;

53

f.  Sexual trauma from being forcibly and repeatedly strip searched in public at the age of 13;

g.  Severe and permanent anxiety and sleep disturbances;

## V. <u>CAUSES OF ACTION</u>

### <u>COUNT ONE</u>

**Violations of TVPRA  18 U.S.C. §§ 1595 and 1584**
**(All Plaintiffs against all WTC/FHW and WTC Holdco)**
**(C.C., V.M., and K.G. against Solstice)**
**(V.M. and L.R. against Trails)**

298.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

299.   The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiffs against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

300.   Plaintiffs were victims of forced labor trafficking in violation of 18 U.S.C. § 1584.

301.   Under 18 U.S.C. § 1584, it is unlawful to knowingly and willfully hold another person to involuntary servitude.

54

302.   Defendants knowingly and willfully held Plaintiffs in involuntary servitude in several ways, including but not limited to the following:

   a.   Creating and maintaining a system wherein Plaintiffs and all other residents were forced to work against their will;

   b.   Requiring Plaintiffs and other trafficking victims to work excessive hours every day in all weather conditions;

   c.   Retaining the financial proceeds from Plaintiffs' labor and that of other trafficking victims while providing Plaintiffs or other survivors with no compensation;

   d.   Maintaining complete control over Plaintiffs' and other survivors throughout the labor arrangement, dictating when, where, and for how long they would work, and under what conditions;

   e.   Maintaining complete control over Plaintiffs' and other survivors' living conditions, food, hygiene, and communications with family and expressly conditioning access to all of it on compliance;

303.   Defendants received financial benefit from the forced labor of Plaintiff and other survivors in violation of 18 U.S.C. § 1584.

304.   Defendants saved money by using unpaid labor to maintain Solstice.

305.   Plaintiffs suffered damages as a result of Defendants' conduct.

55

306.   Defendants received a financial benefit from running a business that recruited, exploited, and manipulated children from desperate families and held them in involuntary servitude under the guise of helping the children with their mental health struggles.

307.   Plaintiffs are entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

## COUNT TWO

**Violations of TVPRA  18 U.S.C. §§ 1595 and 1589**
**(All Plaintiffs against all WTC/FHW and WTC Holdco)**
**(C.C., V.M., and K.G. against Solstice)**
**(V.M. and L.R. against Trails)**

308.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

309.   The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiffs against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

310.   Plaintiffs were victims of forced labor through threats of harm in violation of 18 U.S.C. § 1589.

56

311. Under 18 U.S.C. § 1589(a), it is unlawful to knowingly provide or obtain labor or services by means of: (1) force, threats of force, physical restraint, or threats of physical restraint; (2) serious harm or threats of serious harm; (3) abuse or threatened abuse of law or legal process; or (4) any scheme, plan, or pattern intended to cause a person to believe that they would suffer serious harm or physical restraint if they did not perform such labor or services.

312. Under 18 U.S.C. § 1589(b), it is also unlawful to "knowingly benefit, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services" by the means described in subsection (a).

313. Under 18 U.S.C. § 1589(c)(2) the term "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, reputational harm…"

314. Defendants violated 18 U.S.C. § 1589 because they obtained Plaintiffs' and other survivors' labor through extreme emotional abuse, serious harm in the way of malnutrition, deprivation, psychological harm, physical harm, force, and threats of serious harm.

315. Defendants further violated 18 U.S.C. § 1589 by employing a systemic discipline system as a scheme to cause Plaintiffs and other survivors to rightly believe they would be subjected to serious harm if they refused to work.

316. Defendants violated 18 U.S.C. § 1589 in several ways, including but not limited to the following:

a. Creating, implementing, and maintaining a systematic discipline process that used physical and psychological abuse and threats of physical and psychological abuse to coerce and obtain compliance for forced labor;

b. Threatening to restrict and restricting Plaintiffs' access to food, water, and housing if they did not comply;

c. Threatening to restrict and restricting Plaintiffs' access to communication with family if they did not comply;

d. Physically harming students who tried to run or resist in front of Plaintiff and other survivors;

e. Threatening Plaintiffs with discipline, and giving out discipline, that included forced labor, forced exercise, and psychological punishment if they did not perform unpaid labor;

f. Shaming students who did not comply in front of Plaintiffs and other survivors;

g. Shaming Plaintiffs when they did not comply;

h. Restricting and monitoring Plaintiffs' contact with family members to ensure continuing compliance with forced labor and the steady flow of tuition payments;

i. Threatening to restrict and restricting Plaintiffs' ability to speak if they did not comply.

317. Defendants profited financially through these violations, and, as such, are liable under 18 U.S.C. §§ 1589(b), 1595(a).

318. Defendants knowingly received a financial benefit from their violations of the TVPRA by receiving unpaid labor and services that benefited all Defendants.

319. Defendants saved money by using unpaid labor to maintain Solstice.

320. Plaintiffs suffered damages as a result of Defendants' conduct.

321. Defendants received a financial benefit from running a network of businesses that recruited, exploited, and manipulated children from desperate families and obtained the children's labor through serious harm and threats of serious harm under the guise of helping the children with their mental health struggles.

322. Plaintiffs are entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

## **COUNT THREE**

59

## Violations of TVPRA 18 U.S.C. §§ 1595 and 1590
### (All Plaintiffs against all WTC/FHW and WTC Holdco)
### (C.C., V.M., and K.G. against Solstice)
### (V.M. and L.R. against Trails)

323. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

324. The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiffs against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

325. Defendants benefited from a venture in which Plaintiffs were recruited, transported, and housed for forced labor in violation of 18 U.S.C. § 1590.

326. Under 18 U.S.C. § 1590(a), it is unlawful to "knowingly recruit, harbor, transport, provide, or obtain by any means, any person for labor or services in violation of this chapter."

327. Defendants violated 18 U.S.C. § 1590 in several ways, including but not limited to the following:

    a. Creating and disseminating misleading marketing materials that advertised WTC/FHW and Solstice as offering legitimate industry

leading educational and therapeutic services to recruit Plaintiffs and other survivors;

b. Misrepresenting that discipline would be therapeutic and that labor would be voluntary;

c. Specifically targeting vulnerable children and their desperate families, including teens struggling mental health issues;

d. Housing Plaintiffs and other survivors at all relevant times during which all violations occurred;

e. Controlling all aspects of Plaintiffs' communication with the outside world and editing letters/monitoring calls to remove any negative mention of WTC/FHW or Solstice;

f. Coercing Plaintiffs and other survivors to provide labor through comprehensive physical, psychological, and emotional means;

g. Monitoring and controlling Plaintiffs' and other survivors' behavior during work to ensure continued compliance;

328. Defendants knowingly received a financial benefit from their violations of the TVPRA by receiving unpaid labor and services that benefited Defendants.

329. Defendants saved money by using unpaid labor to maintain Solstice.

61

330.   Plaintiffs suffered damages as described herein as result of Defendants' conduct.

331.   Defendants received a financial benefit from running a network of businesses that recruited, exploited, and manipulated children from desperate families and forced those children into unpaid labor under the guise of helping the children with their mental health struggles.

332.   Plaintiffs are entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

## COUNT FOUR

**Attempted Violations and Conspiracy to Commit Violations of TVPRA 18 U.S.C. §§ 1584, 1589, 1590, 1594, and 1595
(All Plaintiffs against all WTC/FHW and WTC Holdco)
(C.C., V.M., and K.G. against Solstice)
(V.M. and L.R. against Trails)**

333.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

334.   While, as alleged above, Defendants violated 18 U.S.C. §§ 1584, 1589, and 1590, in the alternative, Defendants are liable because they attempted to and did conspire to violate 18 U.S.C. §§ 1584, 1589, and 1590.

335.   The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiffs against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by

62

receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

336. Under 18 U.S.C. § 1594(a)(b) whoever attempts or conspires to violate §§ 1584, 1589, or 1590 shall be punished in the same manner as a completed violation of each section.

337. Defendants intended to violate, took the necessary steps to violate, and conspired to violate 18 U.S.C. §§ 1584, 1589, and 1590, as more fully alleged herein.

338. Plaintiffs suffered damages as described herein as a result of Defendants' conduct.

339. Plaintiffs are entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

## COUNT FIVE

**Beneficiary Liability under TVPRA 18 U.S.C. § 1595**
**(All Plaintiffs against all WTC/FHW and WTC Holdco)**
**(C.C., V.M., and K.G. against Solstice)**
**(V.M. and L.R. against Trails)**

340. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

341. The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by

63

receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

342. As described herein, all Defendants violated several sections of 18 U.S.C. §§ 1581, *et seq*.

343. All Defendants participated in a venture to provide therapeutic services to so-called troubled teens that forced those teens to perform unpaid labor for Defendants' benefit.

344. Defendants knowingly benefited by receiving financial benefits and other things of value through their participation in the venture to provide therapeutic services to so-called troubled teens, including Plaintiffs.

345. Defendants knew or should have known their continuous and systematic practice of forcing teenage girls into labor through force, abuse and threats of force and abuse was in violation of multiple sections of the TVPRA.

346. All Defendants financially benefited, as described herein, because by using unpaid labor to maintain facilities, they saved money they would have spent paying fair wages and taxes.

347. All Defendants received value by forcing Plaintiffs to perform so-called volunteer community work through marketing such work as positive and thereby giving Defendants a positive public image.

64

348. Plaintiffs suffered damages as described herein as a result of Defendants' conduct.

349. Plaintiffs are entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

## COUNT SIX

**Violations of 18 U.S.C. § 2255**
**(All Plaintiffs against all WTC/FHW and WTC Holdco)**
**(C.C., V.M., and K.G. against Solstice)**
**(V.M. and L.R. against Trails)**

350. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

351. The Child Abuse Victims' Rights Act (18 U.S.C. § 2255) provides a civil remedy for minors who suffer personal injuries as a result of certain federal crimes, including forced labor under 18 U.S.C. §§ 1589 and 1590.

352. Plaintiffs were minors while at Solstice. C.C. turned 18 while a resident at Solstice. V.M. and K.G. were minors the entire time they were at Solstice.

353. Plaintiffs suffered personal injuries, as described herein, as a result of Defendants' violations of 18 U.S.C. §§ 1589, 1590.

354. Under 18 U.S.C. § 2255, Defendants' violations of 18 U.S.C. §§ 1589, 1590 entitle Plaintiffs to recover the following: actual damages, liquidated damages in the amount of $150,000, attorney's fees, costs of litigation, punitive damages, and all other equitable relief as the court determines to be appropriate.

65

## COUNT SEVEN

### Negligence
**(All Plaintiffs against all WTC/FHW and WTC Holdco)**
**(C.C., V.M., and K.G. against Solstice)**
**(V.M. and L.R. against Trails)**

355.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

356.   Defendants owed Plaintiffs a duty of care as minors entrusted to their custody and control for therapeutic purposes.

357.   This duty was heightened due to the residential nature of the program and the special vulnerability of the adolescents in Defendants' care.

358.   Defendants breached their duty of care through:

   a.  Failing to provide appropriate mental health care;

   b.  Failing to provide adequate medical care;

   c.  Failing to maintain a safe physical environment;

   d.  Failing to properly hire, train, and supervise staff;

   e.  Failing to protect Plaintiffs from abuse;

   f.  Failing to report suspected and actual abuse of Plaintiffs as required by law;

   g.  Subjecting Plaintiffs to punitive isolation measures;

   h.  Subjecting Plaintiffs to systemic punishments meant to coerce them into compliance;

66

a. Preventing Plaintiffs from communicating with their families, editing their communications, and pushing Plaintiffs if they said anything negative to their families about Defendants; and

b. Forcing Plaintiffs to perform unpaid labor for Defendant's benefit.

359. Defendants acted wantonly, recklessly, and with intentional disregard of its duties of care to Plaintiffs.

360. Defendants' breaches and conduct were the proximate cause of Plaintiffs' injuries and damages.

## COUNT EIGHT

**Breach of Fiduciary Duty**
**(All Plaintiffs against all WTC/FHW and WTC Holdco)**
**(C.C., V.M., and K.G. against Solstice)**
**(V.M. and L.R. against Trails)**

361. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

362. Defendants stood in a fiduciary relationship to Plaintiffs who were entrusted to Defendants' care, supervision, and control.

363. The fiduciary relationship between Plaintiffs and Defendants arose when Defendants solicited, assumed, and maintained complete control and custody over Plaintiffs, including their housing, property, access to food, quality and safety of food, hygiene, water, clothing, medical care, and outside communication with their families.

67

364. Defendants created and maintained Plaintiffs' complete dependence and used it as a coercive tool to keep Plaintiffs enrolled and working and their parents paying tuition.

365. Defendants exercised control over Plaintiffs' ability and desire to leave Solstice and thus ensured continuing control over them through emotional and psychological abuse, false statements, threats, and physical abuse.

366. Plaintiffs were particularly vulnerable to Defendants' coercion and abuse as teens struggling with mental health issues.

367. As a fiduciary, Defendants owed Plaintiffs the utmost good faith, loyalty, full disclosure, and care that required them to place Plaintiffs' interests above their own.

368. Defendants breached their fiduciary duties to Plaintiffs by the acts and omissions described herein that all amounted to Defendants not acting in the best interests of Plaintiffs.

369. Defendants' breach of their fiduciary duties to Plaintiffs was systemic, wanton, and with extreme disregard to Plaintiffs' wellbeing.

370. Defendants' breaches were the proximate cause of Plaintiffs' injuries and damages.

## COUNT NINE

**Unfair and Deceptive Trade Practices (N.C.G.S. § 75-1.1 *et seq.*)**
**(All Plaintiffs against all WTC/FHW and WTC Holdco)**

68

**(C.C., V.M., and K.G. against Solstice)**
**(V.M. and L.R. against Trails)**

371. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

372. Defendants' misrepresentations about the nature of their program and services provided constitute unfair and deceptive trade practices under North Carolina law.

373. The failure to disclose the true nature of the program, inadequate staffing, punitive rather than therapeutic approach, unqualified staff, and forced labor requirements all constitute material misrepresentations affecting commerce.

374. These practices caused injury to Plaintiffs and their families who paid substantial sums for services that were not as represented.

## COUNT TEN

**Civil Conspiracy**
**(All Plaintiffs against all WTC/FHW and WTC Holdco)**
**(C.C., V.M., and K.G. against Solstice)**
**(V.M. and L.R. against Trails)**

375. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

69

376. Defendants entered into a conspiracy to implement harmful policies, cover up reports of abuse, exploit child labor, and repeatedly rebrand to avoid accountability.

377. There was an agreement between defendants to engage in this course of conduct.

378. Overt acts were taken in furtherance of the conspiracy, including the systematic cover-up of reports of abuse and trafficking from NCDHHS; creating misleading marketing to recruit new residents; controlling communication between Plaintiffs and their parents to ensure continued enrollment, free labor, and tuition payments; and the implementation of forced labor policies.

379. Plaintiffs were damaged as a proximate result of this conspiracy.

## VI. <u>N.C. RULE OF CIVIL PROCEDURE 9(J)</u>

380. Plaintiffs assert that Federal Rules of Civil Procedure preempt Rule 9(j) of the North Carolina Rules of Civil Procedure, and therefore Rule 9(j) is not applicable in this case. If it is applicable, Plaintiffs assert that Rule 9(j) is unconstitutional as applied here. Under the circumstances of this case, application of Rule 9(j) is not appropriate because the misconduct giving rise to this action is not medical malpractice. Moreover, application of Rule 9(j) would effectively require Plaintiffs to prove their cases before factual discovery is even begun, violate their rights of due process of law and equal protection under the law, violate their

rights to open courts, violate their rights to a jury trial, violate the separation of powers, and confer an exclusive emolument on health care providers, in violation of the United States and North Carolina constitutions.

381. Under the circumstances of this case, application of Rule 9(j) would violate Plaintiffs' rights under the Seventh and Fourteenth Amendments of the United States Constitution, and Article I, sections 6, 18, 19, 25 and 32 and Article IV, sections 1 and 13 of the North Carolina Constitution. Accordingly, Plaintiffs object to the application of Rule 9(j) in this case. Without waiving their objections, counsel for Plaintiffs provides the following information to comply with the requirements of Rule 9(j): the care rendered by Defendants and all medical records pertaining to the alleged negligence that are available to Plaintiffs after reasonable inquiry have been reviewed before the filing of this complaint by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence and who is willing to testify that the care provided by defendants did not comply with the applicable standard of care.

382. If the Court later determines that Plaintiffs' 9(j) expert does not meet the requirements of Rule 702(b) or Rule 702(c), Plaintiffs will seek to have that person qualified as an expert witness by motion under Rule 702(e) of the Rules of Evidence, and Plaintiffs hereby move the Court, pursuant to Rule 9(j)(2), to so qualify that person.

71

# VII.  JURY TRIAL

383.  Plaintiffs demand a jury trial on all issues.

# VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A. That process issue according to law;

B. Statutory damages of $150,000 per violation pursuant to 18 U.S.C.
   § 2255 for Plaintiffs who were minors at the time of the violations.

C. That Defendants be served with a copy of Plaintiffs' Complaint and
   show cause why the prayers for relief requested by Plaintiffs herein
   should not be granted;

D. That the Plaintiffs be granted trial by jury;

E. That the Court enters judgment against Defendants for all general
   and compensatory damages allowable to Plaintiffs;

F. That the Court enters judgment against Defendants for all special
   damages allowable to Plaintiffs;

G. That Plaintiffs recover all possible damages for Plaintiffs' injuries
   and pain and suffering;

H. That the Court enters judgment against Defendants for all other
   relief sought by Plaintiff under this Complaint;

I. That the cost of these actions be cast upon Defendants;

J. That the Court grant Plaintiffs such further relief which the Court
   deems just and proper.


Dated: December 31, 2025


Respectfully submitted,


*/s/ Ruth Sheehan*

RHINE LAW FIRM, P.C.

Ruth A. Sheehan, NCSB 48069
Email: ras@rhinelawfirm.com
Joel R. Rhine, NCSB 16028
Email: jrr@rhinelawfirm.com
1612 Military Cutoff Road, Suite 300
Wilmington, NC 28403
Tel: (910) 772-9960
Fax: (910) 772-9062

Gareth S. Purnell (*Pro Hac Vice* pending)
Simon B. Purnell (*Pro Hac Vice* pending)
**GRIFFIN PURNELL LLC**
2037 Airline Road, Suite 200
Corpus Christi, Texas 78412
(361) 262-1776
(361) 356-4348 Fax
gareth@griffinpurnell.com
simon@griffinpurnell.com
Service email: support@griffinpurnell.com

*Counsel For Plaintiffs*

73