**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

C.C., V.M., L.R., and K.G.

*Plaintiffs*,

v.

Case No. 1:25-cv-00457-MOC-DCK

WILDERNESS TRAINING &
CONSULTING, LLC (d/b/a FAMILY HELP
& WELLNESS); WTC HOLDCO, LLC;
SOLSTICE EAST, LLC; and JOHN DOE
ENTITIES 1-10,

*Defendants*.

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs, C.C., V.M., L.R., and K.G., (hereinafter "Plaintiffs") file this Memorandum of

Law in Opposition to Defendants' ("Defendants") Motion to Dismiss. ("Motion"; Dkt. #21 and

"Memo in Support"; Dkt #21-1)

### I. INTRODUCTION

Defendants ask this Court to dismiss claims of systematic forced labor, physical abuse, and

exploitation of vulnerable children as nothing more than "structure, discipline, and supervision in

a treatment environment." That framing is not a legal argument — it is a request for this Court to

ignore the detailed factual record Plaintiffs have assembled across 73 pages and 382 paragraphs of

specific, well-pleaded allegations. The Court cannot do that at the pleading stage, and Defendants'

Motion should be denied.

The Complaint does not allege that Defendants failed to provide optimal therapy. It alleges

that Defendants operated a coordinated for-profit scheme in which private equity-backed

management companies recruited vulnerable children through sophisticated false advertising,

Case 1:25-cv-00457-MOC-DCK    Document 22-1    Filed 03/23/26    Page 1 of 18

isolated them from their families, subjected them to a regime of physical violence, food deprivation, sleep deprivation, public humiliation, and illegal restraints, and extracted hundreds of hours of unpaid commercial labor from each child under threat of serious harm. A 12-year-old died in one of Defendants' facilities during the relevant period, suffocated in a burrito hold. State regulators revoked operating licenses. Defendants' own documents show they prioritized keeping lenders "in their happy place" over resident safety.

These allegations, accepted as true under Rule 12(b)(6), plausibly state claims under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1581 et seq.; the Child Abuse Victims' Rights Act, 18 U.S.C. § 2255; and North Carolina law. Defendants' motion should be denied in its entirety.

## II. <u>STANDARD OF REVIEW</u>

A complaint survives a Rule 12(b)(6) motion to dismiss where it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). A claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Critically, plausibility does not require probability. "Asking for plausible grounds to infer" liability requires "more than a sheer possibility that a defendant has acted unlawfully," but demands nothing close to proof. *Id*. Where "a complaint pleads facts that are 'merely consistent

with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557).

Defendants' motion repeatedly asks the Court to accept their characterization of Plaintiffs' experiences over Plaintiffs' own detailed allegations. That is improper at the Rule 12(b)(6) stage.

### III.   ARGUMENT

#### 1.   PLAINTIFFS HAVE ADEQUATELY STATED TVPRA CLAIMS (COUNTS ONE THROUGH FIVE).

#### A. Plaintiffs Have Plausibly Alleged Knowing and Intentional Conduct.

Defendants argue Plaintiffs failed to allege scienter, characterizing the Complaint as alleging only "negligence, mismanagement, or adherence to a program philosophy." *See* Doc. 21-1 at 6. This misrepresents the Complaint in fundamental ways.

The TVPRA's scienter requirement is satisfied by pleading facts from which a court can reasonably infer the defendant knew it was obtaining labor by coercive means or knowingly benefited from a venture that did. 18 U.S.C. §§ 1589(a), (b); 1590; 1595(a). Constructive knowledge — that the defendant "knew or should have known" — is expressly sufficient under § 1595(a) for beneficiary liability claims. The Complaint here alleges actual knowledge, not mere constructive knowledge.

The Complaint alleges that Defendants intentionally designed and implemented a multi-layered coercive system. Defendants created a seven-phase advancement structure in which children could not leave unless they demonstrated "complete compliance" with all program demands, including labor demands. *See* Compl. ¶¶ 139-150. Defendants specifically told parents their children would stay for nine to thirteen months — before those children even enrolled. *See* Compl. ¶ 143. Defendants screened outgoing mail, edited letters to remove negative descriptions of the facility, and punished children who communicated honestly with their families. *See* Compl.

¶¶ 170-176, 295-297. Defendants assigned resident "Inspectors" to monitor other children's labor performance. *See* Compl. ¶ 208. Defendants used labor as punishment — assigning extra cleaning assignments for disciplinary infractions. *See* Compl. ¶ 221.

These are not the actions of entities that inadvertently stumbled into coercive conditions. These are the deliberate operational choices of organizations that intentionally structured their business to extract unpaid labor from children through a system of control, punishment, and isolation. The Complaint further alleges that Defendants knew of repeated regulatory citations, resident deaths, hundreds of negative online reviews, and prior lawsuits, yet continued to operate the same model while marketing a false narrative of therapeutic excellence. *See* Compl. ¶¶ 55-134.

Defendants' reliance on *Muchira v. Al-Rawal*, 850 F.3d 605 (4th Cir. 2017), and *Doe (L.M.) v. 42 Hotel Raleigh, LLC*, 717 F. Supp. 3d 464 (E.D.N.C. 2024), is misplaced. Both involved defendants with limited operational involvement and attenuated knowledge of trafficking activity. Here, Defendants were the operators, designers, and direct beneficiaries of the coercive scheme. They did not merely receive room fees or provide services to an unknowing customer base — they built and ran the coercive system themselves.

**B. Plaintiffs Have Plausibly Alleged Forced Labor Under 18 U.S.C. § 1589.**

Section 1589 prohibits obtaining labor through (1) force or threats of force; (2) serious harm or threats of serious harm; (3) abuse or threatened abuse of legal process; or (4) any scheme intended to cause a person to believe they would suffer serious harm if they did not perform the labor. 18 U.S.C. § 1589(a). "Serious harm" is defined broadly to include "psychological, financial, reputational" harm and is assessed from the perspective of a reasonable person in the victim's position. *See* 18 U.S.C. § 1589(c)(2).

Defendants argue the Complaint alleges only "routine program discipline" insufficient to satisfy § 1589. That argument fails on the facts alleged.

**Threats of Serious Harm.** Defendants threatened to withhold food, hygiene products, and family communications from residents who refused labor or performed it unsatisfactorily. *See* Compl. ¶¶ 148, 216-217, 223, 275-276. Defendants threatened children with isolation in basement protocol — mattress dragged to a basement, lights on continuously, food rationed, for days or weeks. *See* Compl. ¶¶ 155-156. Defendants threatened public shaming in feedback groups, a practice that NCDHHS subsequently cited as abusive. *See* Compl. ¶¶ 218-219. For a vulnerable minor child with mental health challenges, denied access to food, hygiene, and family communication for refusing to clean a stove or shovel manure, the threat of these consequences is precisely the "nonphysical" serious harm § 1589(c)(2) was designed to reach.

**Physical Force and Restraint.** Defendants did not merely threaten — they delivered. Defendants placed children in chokeholds until they lost consciousness, publicly, to deter others. *See* Compl. ¶ 190. Defendants restrained children in "burrito holds" — sleeping bags with the child's face covered, wrapped in a tarp, held down by staff, causing oxygen deprivation and hyperthermia. *See* Compl. ¶¶ 187-189. A child died in this restraint at a Defendants' facility. *See* Compl. ¶¶ 94-97. Plaintiff L.R. was placed in a burrito hold at age 13, not because she was violent or a flight risk, but because she refused to eat a sickening food item she had been served for six consecutive days. *See* Compl. ¶ 265. Plaintiff V.M. was placed in a burrito hold for at least seven consecutive nights. *See* Compl. ¶ 266. These are allegations of physical restraint, not programmatic disappointment.

**Coercive Scheme.** The § 1589(a)(4) prong requires only a scheme, plan, or pattern intended to cause a reasonable person in the victim's position to believe they would suffer serious

harm for refusing to work. Defendants' comprehensive phase system — in which departure, family contact, food access, speech, and hygiene were all conditioned on compliance with every demand — constitutes exactly that scheme. *See* Compl. ¶¶ 139-152, 233-234.

Defendants' reliance on *Ruderman v. Kenosha County*, 752 F. Supp. 3d 1084 (E.D. Wis. 2024), and *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017 (7th Cir. 2024), is unpersuasive. *Ruderman* involved county jail inmates compelled to clean common areas — persons already in lawful custodial confinement whose liberty was independently restricted by operation of law. *Taylor* involved parolees in a program they chose as an alternative to reincarceration. Neither involved minor children, illegally restrained, isolated from family, food-deprived, physically assaulted with illegal restraints, and subjected to a comprehensive coercive scheme designed specifically to extract labor. The cases Defendants cite establish a floor, not a ceiling.

Finally, Defendants argue Plaintiffs failed to allege "labor of economic value." *See* Compl. ¶¶ 204, 227-229, 269, 284-285 refute this directly. Residents performed custodial, food service, landscaping, agricultural, vehicle maintenance, and quality control work to commercial standards. *See* Compl. ¶¶ 204, 228, 285. Defendants never paid for this work, never saw their own employees performing it, and expressly marketed some of it publicly as community engagement. *See* Compl. ¶¶ 225-226, 283. The Complaint plausibly alleges that this labor had substantial economic value and replaced paid employees. *See* Compl. ¶¶ 227, 284.

**C. Plaintiffs Have Plausibly Alleged Involuntary Servitude Under 18 U.S.C. § 1584.**

Section 1584 prohibits knowingly and willfully holding another person to involuntary servitude. Involuntary servitude exists where the victim is compelled to labor against their will through force, threats, or coercion sufficiently serious to compel a reasonable person in the victim's position to remain. *See United States v. Kozminski*, 487 U.S. 931, 952 (1988).

Defendants argue there are no allegations of "physical restraint preventing departure" or "threats of force to compel continued service." *See* Doc. 21-1 at 9. The Complaint directly contradicts this. Defendants placed residents in chokeholds and burrito holds as punishment for non-compliance. *See* Compl. ¶¶ 185-190, 265-266. Defendants used a child's death while fleeing the facility as a recurring threat to deter other children from attempting to leave: "He ran away. If you don't run away, you don't die." *See* Compl. ¶ 245. Defendants controlled every means by which a child could seek help or communicate distress to a parent who might authorize removal. *See* Compl. ¶¶ 170-175, 289-297. Defendants told parents that any complaints from their children were manipulation. *See* Compl. ¶ 175.

For minor children placed at residential facilities in remote locations by parents who had been told to disregard their children's complaints, the coercive conditions Plaintiffs describe plausibly constitute involuntary servitude. A 12-year-old told that running away could kill her, physically restrained in a burrito hold for refusing to eat a sickening meal, and prevented from communicating honestly with her parents, is not in a condition fairly characterized as voluntary program participation.

### D. Plaintiffs Have Plausibly Alleged Trafficking Under 18 U.S.C. § 1590.

Defendants argue parental placement negates any § 1590 trafficking claim because there can be no recruitment for labor exploitation where parents chose the programs. *See* Doc. 21-1 at 9-10. This argument ignores the statutory text and the facts alleged.

Section 1590 prohibits knowingly recruiting, harboring, transporting, providing, or obtaining any person for labor in violation of the TVPRA. 18 U.S.C. § 1590(a). The statute does not require independent procurement free from parental involvement. It requires that the defendant knowingly harbor or otherwise facilitate a person's labor exploitation. Here, Defendants did not

merely house children — they actively isolated them, controlled their communications, and extracted labor from them through a comprehensive coercive scheme. *See* Compl. ¶¶ 148, 170-175, 201-229, 268-288.

Moreover, the Complaint alleges that initial enrollment was procured through fraud. Defendants' sophisticated marketing promised qualified staff, evidence-based therapy, and safe environments. *See* Compl. ¶¶ 39-54, 66-80. Defendants concealed prior deaths, regulatory citations, and the true conditions at their facilities. *See* Compl. ¶¶ 53-54, 71-73. Parents enrolled their children, and continued paying hundreds of dollars per day, in reliance on these misrepresentations. *See* Compl. ¶ 52. Trafficking through fraud is actionable. The parental placement that Defendants describe as exculpatory was itself the product of Defendants' deceptive marketing.

Defendants also argue the § 1590 claim fails because no "exploitation purpose" is alleged. The Complaint alleges specifically that Defendants reduced operational costs by replacing paid staff with unpaid resident labor, *See* Compl. ¶¶ 227, 284, that Defendants faced a $7 million budget shortfall and responded by cutting staff while maintaining forced labor through residents, *See* Compl. ¶¶ 130-133, and that Defendants framed this labor as therapeutic specifically to disguise its economic nature. *See* Compl. ¶¶ 229, 288. That is a plausible allegation of labor exploitation purpose.

**E. Plaintiffs Have Plausibly Alleged Beneficiary Liability Under 18 U.S.C. § 1595.**

Section 1595(a) provides a civil remedy against anyone who "knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in" a TVPRA violation.

This "knew or should have known" standard is significantly less demanding than actual knowledge.

Defendants argue the parent companies — WTC/FHW and WTC Holdco — merely received revenue from lawful services. *See* Doc. 21-1 at 11-12. The Complaint describes something fundamentally different. WTC/FHW was not a passive franchisor. It was the managing member of both Solstice and Trails, providing financial, accounting, marketing, and management services to both. *See* Compl. ¶¶ 14-27. WTC/FHW's CEO personally wrote the marketing materials promising safety and compassion. *See* Compl. ¶ 49. WTC/FHW's founder used his personal website to market the progression system designed to keep children enrolled across multiple facilities. *See* Compl. ¶ 44. WTC Holdco held financial and management authority above WTC/FHW. *See* Compl. ¶¶ 22-27.

The Complaint further alleges WTC/FHW had detailed knowledge of conditions at its facilities — it knew of NCDHHS citations at both Trails and Solstice, knew of prior resident deaths, knew of the mounting public record of abuse and neglect, and yet continued to operate, market, and profit from these facilities. *See* Compl. ¶¶ 55-134. At a minimum, these allegations establish that Defendants knew or should have known that the venture they managed and profited from was engaged in TVPRA violations.

### F. Plaintiffs Have Plausibly Alleged Attempt and Conspiracy Under 18 U.S.C. § 1594.

The Complaint's conspiracy allegations are not conclusory. The Complaint identifies specific co-conspirators (WTC Holdco, WTC/FHW, Solstice, Trails), specific shared policies and procedures, joint marketing, transfer of residents and staff between facilities, coordinated concealment of abusive conditions from regulators and parents, and common financial

Case 1:25-cv-00457-MOC-DCK    Document 22-1    Filed 03/23/26    Page 9 of 18

management. *See* Compl. ¶¶ 103-134, 136, 376-379. These are concrete factual allegations of coordinated conduct sufficient to support an inference of agreement.

Defendants argue that corporate affiliation, without more, does not establish conspiracy. That is true as a legal proposition, but the Complaint alleges far more than mere corporate affiliation. It alleges operational integration, joint decision-making, coordinated cover-up, and shared implementation of the same abusive model across facilities. Compl. ¶¶ 103-120, 129, 136. This is sufficient to plead conspiracy at the pleading stage.

### 2. PLAINTIFFS HAVE ADEQUATELY ALLEGED A VIOLATION OF 18 U.S.C. § 2255 (COUNT SIX).

Section 2255 provides a civil remedy for minors who suffer personal injury as a result of violations of enumerated federal statutes, including 18 U.S.C. §§ 1589 and 1590. 18 U.S.C. § 2255(a). As established above, Plaintiffs have plausibly alleged violations of both §§ 1589 and 1590. Plaintiffs C.C., V.M., and K.G. were minors during their time at Solstice; Plaintiff V.M. was also a minor at Trails; and Plaintiff L.R. was a 13-year-old at Trails. *See* Compl. ¶¶ 9-12.

The Complaint alleges serious personal injuries suffered by each Plaintiff as a direct result of Defendants' TVPRA violations, including PTSD, neurological injury, permanent physical injuries, psychological trauma, sexual trauma, sleep disturbances, and developmental harm. *See* Compl. ¶¶ 302-297. These allegations satisfy the injury element of § 2255 and are expressly tied to the underlying federal violations.

Because Plaintiffs have adequately pled the predicate TVPRA violations, Count Six survives.

### 3. PLAINTIFFS HAVE ADEQUATELY STATED THEIR STATE LAW CLAIMS (COUNTS SEVEN THROUGH TEN).

**A. Plaintiffs' Claims Are Not Medical Malpractice Claims.**

Defendants attempt to reframe Plaintiffs' abuse claims as medical malpractice, invoking N.C. Gen. Stat. § 90-21.11 and its Rule 9(j) certification requirements. This reframing is both legally and factually incorrect.

Medical malpractice in North Carolina concerns the deviation of a healthcare provider from the standard of care in the provision of health services. N.C. Gen. Stat. § 90-21.12. Plaintiffs do not allege that a therapist misdiagnosed a mental health condition or chose the wrong treatment modality. Plaintiffs allege that Defendants beat children, placed them in illegal restraints, denied them food and medical care, isolated them from their families, and forced them to perform hundreds of hours of unpaid commercial labor under threat of serious harm. These are not treatment decisions — they are abusive acts and intentional torts.

The mere fact that Defendants operated under the guise of therapy does not transform every allegation against them into a malpractice claim. A residential facility that forcibly restrains a child, restricts her food, and compels her to clean stoves and shovel manure is not practicing medicine — it is committing torts. Plaintiffs have characterized their claims accordingly.

Plaintiffs have also complied with Rule 9(j) as a precautionary matter. *See* Compl. ¶¶ 380-382. The Court need not resolve the malpractice characterization issue to deny the motion.

**B. Plaintiffs' State Law Claims Are Timely.**

Under N.C. Gen. Stat. § 1-17(a), the statute of limitations for a minor plaintiff is tolled during minority, with the period running from the date the disability is removed (i.e., when the plaintiff reaches the age of 18). For general negligence and breach of fiduciary duty, the applicable period is three years; for UDTPA claims, four years.

However, even if any particular Plaintiff's claim facially appears untimely, the Complaint pleads facts supporting equitable tolling. Defendants systematically prevented Plaintiffs from communicating honestly with their families about conditions at the facilities. *See* Compl. ¶¶ 170-176, 295-297. Defendants told parents their children were lying or manipulating them. *See* Compl. ¶ 175. Defendants actively marketed a false narrative of safety and effectiveness even after deaths, regulatory citations, and adverse reports. *See* Compl. ¶¶ 71-73, 134. These are factual allegations of active concealment that may toll the statute of limitations under North Carolina's fraudulent concealment doctrine. *See Bernick v. Jurden*, 306 N.C. 435, 293 S.E.2d 405 (1982).

Dismissal on limitations grounds at the pleading stage is appropriate only where untimeliness is apparent on the face of the complaint. *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). That standard is not met here, where the applicable tolling rules present questions of fact inappropriate for resolution on a Rule 12(b)(6) motion.

### C. Plaintiffs Have Adequately Alleged Negligence.

The Complaint alleges that Defendants assumed full custodial responsibility for Plaintiffs — controlling their housing, food, medical care, hygiene, communications, and movement. *See* Compl. ¶¶ 148, 233, 363. This relationship, in which Defendants held themselves out as expert caregivers for vulnerable minor children with mental health conditions, created heightened duties of care. *See* Compl. ¶¶ 40-41, 356-357.

The Complaint alleges numerous specific breaches: denial of medical care to a child with a dangerously high fever for three days, *See* Compl. ¶ 259; forcing a child with severe knee pain to continue weeks-long arduous hikes under threat of punishment, *See* Compl. ¶ 260; use of illegal restraints causing physical injury and oxygen deprivation, *See* Compl. ¶¶ 185-189, 265-266; denial of bathroom breaks causing children to urinate on themselves during hikes, *See* Compl. ¶¶ 252-

253; use of electric shock devices, *See* Compl. ¶ 302(a); strip searches conducted by untrained male staff in the presence of other residents, *See* Compl. ¶¶ 184, 231-232; and forcing children to perform labor while sick or injured, *See* Compl. ¶¶ 212, 274.

These specific factual allegations of duty, breach, causation, and damages are more than sufficient to state a negligence claim under Rule 12(b)(6). Defendants' argument reduces to disagreement with the factual characterizations — a dispute that cannot be resolved at the pleading stage.

### D. Plaintiffs Have Adequately Alleged Breach of Fiduciary Duty.

A fiduciary relationship arises when one party places trust and confidence in another who undertakes to act in the beneficiary's interest. Plaintiffs were minor children with mental health conditions placed by their parents in facilities that assumed total custodial control. *See* Compl. ¶¶ 148, 233, 363. Defendants solicited this position of trust through marketing that promised care and safety. *See* Compl. ¶¶ 39-54.

The Complaint alleges specific breaches: Defendants extracted unpaid labor for their own financial benefit, *See* Compl. ¶¶ 226-229, 283-284; Defendants concealed abusive conditions from parents to maintain enrollment and tuition revenue, *See* Compl. ¶¶ 174, 297; Defendants prioritized financial interests over resident safety during a period of operational cost-cutting, *See* Compl. ¶¶ 130-133; and Defendants used Plaintiffs' complete dependence as a coercive tool rather than a trust to be honored. *See* Compl. ¶¶ 364-365. These are not conclusory assertions of generalized wrongdoing — they are specific allegations of self-dealing and breach of the trust relationship Defendants cultivated.

**E. The Learned Profession Exception Does Not Bar Plaintiffs' UDTPA Claims.**

North Carolina's UDTPA exempts "professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b). Courts have interpreted this exception to cover acts "directly related to patient care" and not commercial conduct in the marketplace. *See Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 336, 828 S.E.2d 467 (2019).

The Complaint's UDTPA allegations are directed at Defendants' commercial conduct in the marketplace: sophisticated false advertising, material omissions about facility safety records, misrepresentation of staff qualifications, publication of misleading outcome statistics, and active concealment of prior resident deaths and regulatory citations from prospective clients. *See* Compl. ¶¶ 39-134. This conduct occurred before any professional relationship was established and was directed at parents in the commercial marketplace, not at patients in a clinical context. It falls squarely outside the learned profession exception.

Moreover, Plaintiffs — the minor residents — were not themselves the recipients of Defendants' marketing. *See* Compl. ¶ 52. The UDTPA claims are directed at the commercial harm to families who paid hundreds of dollars per day in reliance on materially false representations. These are marketplace transactions, not the rendering of professional services.

**F. Plaintiffs Have Adequately Alleged Civil Conspiracy.**

Because Plaintiffs have adequately alleged the underlying torts of negligence and breach of fiduciary duty, civil conspiracy is properly pleaded as a derivative theory attributing corporate co-conspirators' liability for the common scheme. *See Piraino Bros., LLC v. Atl. Fin. Grp., Inc.*, 211 N.C. App. 343, 350, 712 S.E.2d 328 (2011).

The Complaint alleges: shared ownership and control across all Defendant entities, *See* Compl. ¶¶ 14-28; coordinated marketing concealing abusive conditions, *See* Compl. ¶¶ 71-73, 134;

shared policies and staff across facilities, *See* Compl. ¶¶ 116, 129, 136; a deliberate practice of rebranding facilities to evade accountability while maintaining the same ownership and coercive practices, *See* Compl. ¶¶ 117-119; and coordinated effort to withhold information from regulators and parents. *See* Compl. ¶¶ 99-101, 376-379. These allegations identify specific overt acts by multiple Defendants in furtherance of a common scheme, which is precisely what the conspiracy pleading standard requires.

## **CONCLUSION**

The Complaint presents detailed, specific, and harrowing allegations that four vulnerable minor children were subjected to physical violence, illegal restraints, food deprivation, isolation, sexual humiliation, and hundreds of hours of coerced, unpaid labor by a private equity-backed network of facilities that marketed false promises of safety and therapy while extracting maximum profit from their parents. These allegations, accepted as true, plausibly state claims under the TVPRA, 18 U.S.C. § 2255, and North Carolina law.

Defendants' Motion to Dismiss asks this Court to accept a sanitized version of events — "structure, discipline, and supervision" — over Plaintiffs' detailed factual record. Rule 12(b)(6) does not permit that substitution. Defendants' Motion should be denied in its entirety.

Respectfully Submitted,

**GRIFFIN PURNELL LLC**
2037 Airline Road, Suite 200
Corpus Christi, Texas 78412
(361) 262-1776
(361) 356-4348 Fax
gareth@griffinpurnell.com
simon@griffinpurnell.com
Service email: support@griffinpurnell.com

By: /s/ Gareth S. Purnell
    Gareth S. Purnell (Admitted *Pro Hac Vice*)
    Simon B. Purnell (Admitted *Pro Hac Vice*)

and

Ruth A. Sheehan, NCSB 48069
Joel R. Rhine, NCSB 16028
**RHINE LAW FIRM, P.C.**
1612 Military Cutoff Road, Suite 300
Wilmington, North Carolina 28403
(910) 772-9960
(910) 772-9062 Fax
ras@rhinelawfirm.com
jrr@rhinelawfirm.com

**ATTORNEYS FOR PLAINTIFFS**

## USE OF ARTIFICIAL INTELLIGENCE CERTIFICATION

No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources of Westlaw and Lexis, Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at my discretion as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

## CERTIFICATION OF WORD COUNT OR PAGE LIMITS

Pursuant to LCvR 7.1(d), the undersigned hereby certifies that this brief complies with the applicable word-count and/or page limitation, excluding the caption, signature block, and certificate of service.

This the 23rd day of March, 2026.

**GRIFFIN PURNELL LLC**
2037 Airline Road, Suite 200
Corpus Christi, Texas 78412
(361) 262-1776
(361) 356-4348 Fax
gareth@griffinpurnell.com
simon@griffinpurnell.com
Service email: support@griffinpurnell.com

By: /s/ Gareth S. Purnell
    Gareth S. Purnell (Admitted *Pro Hac Vice*)
    Simon B. Purnell (Admitted *Pro Hac Vice*)

and

Ruth A. Sheehan, NCSB 48069
Joel R. Rhine, NCSB 16028
**RHINE LAW FIRM, P.C.**
1612 Military Cutoff Road, Suite 300
Wilmington, North Carolina 28403
(910) 772-9960
(910) 772-9062 Fax
ras@rhinelawfirm.com
jrr@rhinelawfirm.com

**ATTORNEYS FOR PLAINTIFFS**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this the 23rd day of March, 2026, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of this electronic

filing to all parties and or counsel of record in this action.

David L. Levy
Kristy M. D'Ambrosio
**GARDNER SKELTON, PLLC**
3746 N. Davidson Street
Charlotte, North Carolina 28205
dlevy@gardnerskelton.com
kdambrosio@gardnerskelton.com
*Attorneys for Defendants*
*Wilderness Training & Consulting,*
*LLC d/b/a Family Help & Wellness,*
*WTC Holdco, LLC, and*
*Solstice East, LLC and Trails Carolina, LLC*

 */s/ Gareth S. Purnell*
Gareth S. Purnell